## EASON v. THE STATE.

CRIMINAL LAW. *Jury. Newspaper account will disqualify. When.* Jurors are not impartial who have formed or expressed an opinion, either from hearing the evidence, or from hearing others detail it who did hear it, or from conversing with those who professed to know the facts and to give a detail of them, or from hearing such persons in conversation with others giving such details, and a juror who has thus formed or expressed an opinion, cannot render himself impartial by expressing his belief, on his examination, that he can render a fair and impartial verdict according to the law and the proof, notwithstanding the opinion then in his mind. A trial by such a jury is not a fair and impartial one. An impartial juror is one who enters the box indifferent between the parties, indifferent in feeling and in opinion. Either partiality or prejudice, in the usual acceptation of these words, or an opinion based on the supposed facts, existing in his mind, renders it impossible for him to be indifferent, and, therefore, to be impartial. The act of 1870–71 is therefore unconstitutional and void, which provided that no juror should be disqualified by any opinion which he may have, based upon any published account of the facts of the offense with which the prisoner is charged.

Cases cited: Rice *v.* State, 1 Yer., 432; McCowan *v.* State, 9 Yer., 192; Payne *v.* State, 3 Hum., 375; Brakefield *v.* State, 1 Sneed, 215; Norfleet *v.* State, 4 Sneed, 340.

### FROM SHELBY.

Appeal from the Criminal Court. JNO. R. FLIPPIN, Judge.

J. D. ADAMS for plaintiff.

ATTORNEY-GENERAL HEISKELL for the State.

NICHOLSON, C. J., delivered the opinion of the court.

In October, 1871, E. J. Eason was put upon his

.trial in the Criminal Court at Memphis for the murder of Ed. Lyles, and was convicted of murder in the first degree, with circumstances of mitigation, but sentenced to be hung. He has appealed to this court, and relies on various errors for a reversal of the judgment.

The first error relied on is assigned upon the proceedings in the formation of the jury. It appears that ten jurors were summoned, who, being challenged for cause, stated on their *voir dire* that they and each of them had formed and expressed an opinion as to the guilt or innocence of the defendant; that the newspaper account on which their opinion was based purported to give an account of the facts of the case, but did not purport to give the testimony in the case; and that, if accepted and sworn as jurors in this case, they believed they could give a fair and impartial verdict on the law and the testimony. Each one stated that his impressions as to the guilt or innocence of the defendant were derived solely from newspaper accounts, but each said he felt that he could lay aside any opinion thus formed and be governed by the law and evidence exclusively. One of the jurors stated that the newspaper account had made such an impression on his mind as to the guilt or innocence of the defendant as would require full testimony to remove, but if sworn as a juror, he believed that he could render a fair and impartial verdict according to the law and testimony exclusively, without reference to what he had read. This juror was then challenged for bias, and the challenges to

all of said jurors overruled. The defendant exhausted thirty-five peremptory challenges, including the above named, and then severally demanded challenges peremptorily for the other said jurors afterward presented by the State, which the court disallowed.

It is obvious that the proceedings in the formation of the jury were governed by the act of 1870–71, ch. 51 (Shankland, 159). This act is as follows:

"That hereafter no citizen, in any criminal prosecution in this State, shall be adjudged incompetent to act as a juror by reason of having formed or expressed an opinion touching the guilt or innocence of the accused upon information derived exclusively from any published account of the facts of the offense with which the defendant stands charged, unless the writer of said statement in said article professed to have been a witness to the same at the time of their occurrence, which must affirmatively appear; and provided that said juror will state, upon the law and the testimony, on trial, he believes he can give the accused a fair and impartial verdict."

It is manifest that the jury was formed in accordance with this act; and if the act is not in contravention of the Constitution of the State, the defendant was tried by an "impartial jury."

It is insisted for defendant that the act is in violation of art. 1, sec. 9, of the Constitution of the State, which secures to the accused in all criminal prosecutions "a speedy public trial by an impartial jury of the county in which the crime shall have been committed."

The clause in our Constitution which guarantees to those accused of crime "a public trial by an impartial jury," is one among the many provisions in that instrument which have descended to us from the great charter of English liberty which are declaratory of the rights of the people, and which have acquired a well-understood meaning, and must therefore be presumed to have been adopted in view of that meaning. If, therefore, the term "impartial jury" has been defined in the history of constitutional law, it is to be assumed that the sense fixed upon the words in legal and constitutional history, where they have been employed for the protection of popular rights, is the sense in which they have been adopted in our Constitution. Cooley's Const. Lim., 60.

According to the definition of our standard lexicographer, a man who is "impartial" is one "who is not biased in favor of one party more than another;" who is "indifferent; unprejudiced; disinterested; as an impartial judge or arbitrator." The primary idea contained in this definition, is freedom from personal bias, indifference between the parties as persons; "not prejudiced" against one or the other; "disinterested" as between them. But it is clear that the word was not used exclusively in its primary sense, but in its secondary or more general sense—as freedom from any bias, or indifference, or disinterestedness—for we find that Sir Edward Coke, in enumerating the principal causes of challenge *propter de fectum*, specifies the following: "That a juryman is of kin to either party within the ninth degree; that he has an interest in

the cause; that there is an action depending between him and the party; that he has taken money for his verdict; that he has been arbitrator, or declared his opinion on either side," &c. 1 Tidd, 853; Co. on Lit., 156; 3 Bur., 1856; 5 Bac., 353. It appears from these authorities that the fact that a juryman "had declared his opinion on either side," was a principal cause of challenge on the ground that he was not "impartial." But it was competent for the Legislature to change or modify this rule of the common law, unless it has become so engrafted upon the Constitution of the State as to be irrepealable or unalterable by the Legislature. The guaranty of a trial by an "impartial jury" has been secured to the accused in exactly the same language in the Constitution of 1796, 1834 and 1870. It would be a remarkable fact if the legal import of the words "impartial jury," as used in all three of our Constitutions, should now be a matter of sufficient uncertainty to render it necessary to resort to a philological investigation to ascertain their true meaning. They were introduced into "the bill of rights" in 1796, and we are to presume that they were adopted with a full understanding of their legal import, as ascertained and settled by judicial interpretations in England. But if there was any doubt as to this proposition, if we shall find that there has been an unbroken chain of judicial construction from 1796 down to 1834, when the same words were again adopted in the Constitution of that year; and that from 1834 down to 1870, when the same words were adopted for the third time

in the Constitution of that year; and if we find, throughout this succession of decisions, the same construction has been uniformly placed upon the words, we are forced to the conclusion that that construction is to be regarded as the true legal, judicial and constitutional meaning of an "impartial jury."

We proceed to ascertain this meaning by referring to the several cases in which the words have been interpreted.

In the case of *Rice* v. *State*, 1 Yer., 432, the court held that "a juror who declares he has formed and expressed an opinion from having heard the witness or testimony touching the alleged crime, is incompetent to sit as a juror upon the trial, and therefore subject to peremptory challenge." In this case the jurors, upon stating that they had formed their opinion from having conversed with the witnesses, or from hearing them converse, were asked whether, notwithstanding that opinion, they were in a condition to try the cause impartially, and upon answering in the affirmative, they were put to the prisoner as competent. This raised the exact question, whether a juror thus presented was an impartial juror under the Constitution. The court held that the rule is, that jurors should be *omnia exceptione majores*, and that jurors who had formed and expressed opinions, although they believed they could act impartially, were not competent, because they were under "prejudice or partiality." Therefore, the court laid down the rule quoted.

In the case of *McGowan* v. *State*, 9 Yer., 192,

one of the jurors put to the prisoner, on his examination, stated that he had formed his opinion on rumor and upon a detail of the circumstances from persons, however, who did not profess to have been eye-witnesses of the transaction. The court were of opinion that the juror ought to have been rejected for cause, and proceeded to lay down the rule in such cases as follows: "If it appears to the judge, who, under our system, is the trier of the competency of the juror, that he has heard the circumstances of the case, and believing the statements he has heard to be true, has formed, or formed and expressed, an opinion, that is, has made up his mind as to the guilt or innocence of the prisoner, he ought to be rejected."

In the case of *Paine* v. *State*, 3 Hum., 375, the jurors, on their examination, stated that from rumor and from the reports in their neighborhood they had formed their opinions. They were put to the prisoner as competent jurors. The court, after quoting the rule as laid down in *McGowan* v. *State*, proceeded to say: "We do not know that a rule can be laid down on this subject more clear, explicit, and free from ambiguity. We have given it a careful reconsideration, and believe that in all its parts it is an accurate and just determination of the grounds and principles upon which the impartiality of a juror may be tested. On the other hand, vague and floating rumors, although they put on the form of a narative and circumstantial detail of facts, will not produce such an impression on a juror's mind as to affect his impartiality."

In the case of *Brakefield* v. *State*, 1 Sneed, 215, one of the jurors had said, before the trial came on, that he had formed his opinion in the case, and that the prisoner ought to be hung.  He nevertheless qualified himself on his examination by the court, and was put to the prisoner as a competent juror and accepted.  On a motion for a new trial, proof was made that the juror had made the statements referred to.  The court said: "The juror's statement is in the strongest terms of opinion, conviction and prejudice.  He stands clearly convicted of having prejudged the case.  If he was put to the prisoner as a competent juror, when in fact he was incompetent, the rights of the prisoner were violated."

In the case of *Norfleet* v. *State*, 4 Sneed, 340, one of the jurors, on his examination, stated that he had said, soon after the killing, that the prisoner ought to be hung, but at that time he had no opinion as to the guilt or innocence of the prisoner.  He was put to the prisoner as competent.  The court held that this was error, saying that by the admission, that he had said the prisoner ought to be hung, the juror was incompetent, having prejudged the prisoner's case.

Without reviewing the cases further, we have cited enough to establish beyond controversy the proposition that, during the existence of the Constitution of 1796 and 1834, the legal meaning of "an impartial jury," was one which had neither formed nor expressed an opinion as to the guilt or innocence of the accused, whether from conversing with the witnesses, or hearing them converse, or hearing a narrative and detail

of the facts. If we had any doubt as to the correctness of the interpretation of these words, repeated through a period of three-quarters of a century, it would approach to rashness and presumption in us to disregard such authority. But we have no such doubt, and therefore recognize it as the settled meaning of the constitutional guaranty that the accused has the constitutional right to be tried by jurors who are "impartial," and that none are impartial who have formed or expressed their opinions, either from hearing the evidence or from hearing others detail it who did hear it, or from conversing with those who professed to know the facts and to give a detail of them, or from hearing such persons in conversation with others giving such details. When the Constitution of 1870 was adopted, the same language, which had thus been judicially interpreted, was again re-adopted, and, we have a right to presume, with full knowledge of its uniform interpretation in the Constitution of 1791 and 1834. This being so, this interpretation of the language becomes incorporated with the Constitution of 1870 as part of the fundamental law of the State. The decisions which have fixed the true meaning of the words "impartial jury," also establish the position that a juror who is incompetent from having formed or expressed an opinion as to the guilt or innocence of the accused, cannot render himself "impartial" by expressing his belief, on his examination, that he can render a fair and impartial verdict according to the law and the proof, notwithstanding the opinion then in his mind.

Eason v. The State.

The remarks of Judge Peck on this point, in the case of *Rice* v. *The State*, are conclusive. He says: "What is the condition of a juror when such a question is propounded? He will feel it as an appeal to his pride and magnanimity. He will naturally imagine he can, nay, he has already, divested himself of his prepossessions, and will answer in the affirmative. But who that has taken the slightest view of human nature can help seeing, that immediately on hearing a repetition of the same evidence which first raised his prepossessions, they will return upon him? Or, placing himself upon his resolution, he will err on the other side, and reject the evidence which, but for the appeal to his pride, would have had its due weight."

It is not an unreasonable presumption that a juror who goes into the box with prepossessions in his mind, "will," as Chief Justice Marshall observes, "listen with more fervor to that testimony which confirms, than to that which would change his opinion. It is not to be expected that he will weigh the testimony as well as one whose opinion is not made up in the case." 1 Burr's Trial, 419.

When the Constitution guarantees to the accused an impartial jury, it necessarily means that he is entitled to a jury which can enter upon the examination of his case, conceding to him the full benefit of that presumption of innocence which the law gives to every prisoner as a matter of right. This presumption entitles him to an acquittal until it has been overturned by plenary proof. In the formation of the jury under the statute in question, the prisoner

may have forced on him as his triers twelve men who will enter the box with the conviction on their minds that he is guilty, and he must stand convicted in their judgments until he has, by full proof, overcome their convictions of his guilt and established his innocence. This would be a virtual reversal of the fundamental principle, that the law presumes the accused to be innocent until the proof shows him to be guilty. It is little else than a mockery to try the competency of a juror by asking if he has formed and expressed his opinion of the guilt or innocence of the accused, and when he answers that he has upon having heard or read the facts, then to take him as an impartial juror, upon his belief that he can divest himself of his convictions and render a fair and impartial verdict. A prisoner whose life or liberty is submitted to a jury composed of such men, cannot be said to have a fair trial by an impartial jury. We hold that an impartial juror is one who enters the box indifferent between the parties, indifferent in feeling and in opinion. Either partiality or prejudice, in the usual acceptance of these words, or an opinion based on the supposed facts of the case, already existing in his mind, renders it impossible for him to be indifferent, and therefore to be impartial. If he is partial or prejudiced, he will enter upon the trial predisposed to follow his partiality or prejudice in weighing the testimony. If he enters the box with an opinion already made up, he will be in danger of so viewing and weighing the testimony as to sustain and confirm his existing im-

pressions.   One of the jurors who was put to the prisoner in this case as competent, stated that the impressions made on his mind by reading the detail of facts as they were given in the newspaper, were such that the proof to remove them must be full. When could a jury composed of men such as the juror referred to be said to be indifferent?   Certainly never, until their convictions of guilt had been removed by full proof of innocence.   Is it not an abuse of language to call such a jury an impartial one?   To be an impartial jury, they should enter the box indifferent at the time of entering it between the State and the accused.   The courts have gone to the verge of the law in holding that a juror who has formed and expressed an opinion on mere rumor, may be an impartial juror.   We recognize such to be the settled law, but we are not disposed to go further in that direction. . It has been urged with much earnestness and force that the act of the Legislature in question ought to be sustained upon considerations of public policy.   Considerations of this character can have no place in considering questions involving the constitutionality of laws, except in cases where there is doubt as to the power of the Legislature to enact the laws.   Then it is a settled rule . of courts to give weight to the action of the Legislature, upon the assumption that it is the peculiar provision of the legislative department to determine questions of public policy.   But it is our duty, and the highest and most responsible imposed upon us, to guard the Constitution against infractions.   When we

are called upon to determine constitutional qu· stions, if we are in no doubt, our path of duty is plain and straightforward. Such is our present position. We are satisfied that the act in question violates the Constitution, and, without considering the question of public policy involved in it, we are bound so to declare. It follows that the court below erred in the formation of the jury, and that for this error the judgment must be reversed and a new trial awarded. This result renders it unnecessary to consider the other grounds for reversal relied on by defendant.